**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | |
|---|---|
| **ANTONIA DENICOLA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) No.: **9:12-cv-2690-SB-BM** |
| | ) |
| **TOWN OF RIDGELAND AND RIDGELAND** | ) |
| **POLICE DEPARTMENT** | ) |
| | ) |
| **Defendants.** | ) |

**FACTUAL BACKGROUND**

Antonia Denicola began working for the Town of Ridgeland in 2005. She was

hired as the Town's Victim's Advocate/Police Department Secretary.

Denicola was a problem employee. Throughout her employment, however,

Police Chief Richard Woods looked past these problems and, in his own words, was

Denicola's biggest "advocate" at the Town. (Ex. B Woods, p. 93). Seven months after

hiring her, however, Denicola submitted her resignation to accept a sales position with a

landscaping company. (Ex. A. Denicola pp. 30-34). However, she quickly decided she

did not like the sales job and called Chief Woods to see if she could get her job back.

Woods gave her the job back and got her a $5,000 raise from her starting salary. (*Id*.).

Another four months later (October 2007) Denicola again said she was leaving for a

similar position in Hardeeville, South Carolina that paid $10,000 more. Jason Taylor, the

Town Administrator, wanted to let her go but Chief Woods wanted to keep her and

offered her extra money cleaning the police department offices ($5,200 per year) and he

1

allowed her to drive a surplus police department vehicle. (*Id.* at 44-47) (Ex. C, Taylor p. 20). (The car was later taken away, in 2009, at the direction of the Town Council, because the Council thought she did not need it.). (Ex. D, Bates 145).

In October 2007, Denicola complained to Capt. Frank Mador that a Town Councilmen made an inappropriate remark about how she walked. Capt. Mador reported the complaint to Chief Woods who reported it to the Town Administrator. The Administrator spoke to the councilman and Denicola admits nothing ever happened again. (Ex. A. Denicola p. 236). (This incident was not included in Denicola's EEOC charge or her Complaint but it demonstrates she knew she could complain about such incidents).

Denicola frequently complained that she had too much work to do. (Ex. A DeNicola p. 24) (Ex. C, Taylor p. 19) (Ex. B, Woods pp. 22, 72). For example, In December 2008, she complained that she did not have time to do record clerk duties (Ex D, Bates 121). When asked to help enter traffic tickets, she complained she had too much work to do. (Ex. D, Bates 133). At one point, another officer was going to be given the Victims Advocate duties. She took offense to that and complained they were trying to take work away from her. (Ex. D, Bates 139, 133). Taylor and the Chief testified that Denicola constantly complained to them about her workload. (Ex. C, Taylor p. 19) (Ex. B, Woods pp. 22, 72).

Denicola also had disagreements with coworkers and performance issues. As explained more fully below, she got into a heated argument with Officer Chris McIntosh. She also did not get along with Officer Dobbs who accused her of wasting time browsing the internet when she should be working. (Ex. A Denicola pp. 106-108). The situation

deteriorated to the point where Chief Woods had to have a meeting with both of them. The Town's Magistrate Judge complained that DeNicola was not empathetic and failed to notify victims of court dates. (Ex. C, Taylor pp. 14-16). Taylor also received complaints from victims about DeNicola. (Ex. C, Taylor pp. 14-16). Taylor described one incident in which the victim was distraught and wanted guidance on getting legal aid or mental help. According to Taylor, DeNicola's attitude was that that the victim needed to "get over it." (*Id.*). DeNicola admitted she was aware that complaints were made about her. (Ex. A. Denicola p. 95). In response to these complaints, the Town Administrator sat in on meetings that DeNicola had with victims. He reached the same conclusions that the Magistrate Judge reached. The Administrator also received complaints from crime victims that they were not getting the assistance they needed from DeNicola. (Ex. C, Taylor pp. 15-18).

Denicola accused other employees of spitting on her car, pouring coffee on it, and letting the air out of a tire thereby causing her to have an flat tire while on the road. She had no evidence other Town employees did this, yet she insisted on filing a criminal report and she badgered Capt. Frank Mador and the Chief about investigating her complaint. (Ex. D, Bates 420); (Ex. B Woods pp. 79-80); (Ex. E, Mador pp. 48-49).

The Chief had to intervene in another situation in which Denicola loaned money to Mador (whom she regarded as a son). Denicola later began bickering in the workplace about not getting paid back. (Ex. A, Denicola pp. 79) (Ex. B, Woods p. 53). The Chief told her to keep personal issues like that from disrupting the workplace.

The Chief also had to counsel Denicola for grossly abusing her Town-issued cell phone. In one month time period, she used it over 5000 minutes. (Ex. B, Woods p. 56).

On January 6, 2011, DeNicola and Officer Chris McIntosh got into a heated argument about doing "Rule 5" requests.  McIntosh had no supervisory authority.  He and Denicola were coworkers.   Rule 5 requests are requests by criminal defense attorneys for the police department's investigative files.  Versions of the argument vary, but, basically, she and McIntosh disagreed about who was to handle certain parts of the requests. (Denicola Complaint).   The argument started when Denicola left Rule 5 materials in McIntosh's office for him to handle and he took offense.  Some yelling occurred near DeNicola's desk and then McIntosh went back to his office.  DeNicola followed him, allegedly to continue to explain how the Rule 5s were to be processed.   More yelling occurred in McIntosh's office.  (*Id.*); (Ex. A. Denicola pp. 87-90).  Denicola then ran outside the Police Department to find Chief Woods and Capt. Mador to whom she tearfully exclaimed "I don't get paid to take this fucking shit."  (Ex. A. Denicola p. 89). (Ex. B, Woods p. 63); (Ex. E, Mador p. 57).  She then quickly went back inside.  Taken aback, Woods and Mador decided Mador would investigate the matter.  (*Id.*).

DeNicola filed a "harassment report" the same day.  Although DeNicola describes the report, in this lawsuit, as a sexual harassment report, nowhere in her written complaint does she infer that McIntosh was sexually harassing her or that her gender had anything to do with his treatment of her.  (Ex. F, Denicola Harassment Complaint).   In her deposition, she confirmed her written " harassment report" was an accurate depiction of the event and that she had nothing to add to it.  (Ex. A. Denicola pp. 90-92). Denicola's very detailed written complaint describes a heated argument between two employees over a work issue—not a sexual harassment incident.  After the investigation,

Chief Wood could not make a determination as to who was at fault but he did counsel McIntosh on his behavior.

At that same time that DeNicola had this argument with McIntosh, the Town had an opening in its Water Department for a clerk.  Town Administrator Jason Taylor was already unhappy with Denicola's work performance and history of issues.  (Ex. C, Taylor pp. 14, 17, 19).  Taylor testified that he offered the water department position to Denicola and that she voluntarily took it.  (Ex. C, Taylor pp. 27-30).  The Water Clerk Supervisor, Penny Daley, confirmed that Denicola was offered the position.  (Ex. G, Affidavit Daley).  Woods testified that he had nothing to do with the transfer and was actually against it.  (Ex. B, Woods pp. 67-68).  He wanted to keep Denciola in her position in the Police Department.  Denicola testified that she was not given a choice.  (Ex. A, Denicola pp. 124-125).  Interestingly, a few days after the transfer, Denicola wrote Taylor a memorandum complaining that the transfer cost her overtime opportunities and that she lost the side-job cleaning the police department offices.  (Ex. D, Bates 38).  The memorandum is interesting because she complains only about the financial effect of the move and does not claim it was retaliatory, punishment, or that it arose from any harassment.

It is undisputed that Denicola's salary was unaffected by the transfer although she claims the move cost her overtime opportunities.  She also claims that she lost the opportunity to clean the police offices for extra money (or that the Chief took this opportunity from her shortly after the McIntosh incident).  Chief Wood testified that he decided to do away with the part time cleaning position for budget reasons and no one ever was given that position again.  (Ex. B, Wood pp. 33-35).

Denicola began working in the Water Department in late January 2011. (Ex. D Bates 145) (Ex. I. Denicola pp. 123, 170-171). She did not do well in the Water Department. Her duties were to help keep track of water bills/accounts and to receive and account for monies. Unlike the Victims Advocate position, Denicola had to work directly with other employees, she was more closely supervised, and the Department had more definite production requirements. (Ex. G, Affidavit Daley). Denicola made frequent mistakes. Her cash drawer often did not balance. She was constantly behind in entering payments. She had a pattern of taking days off around the 15th of each month. (Ex. A DeNicola p. 175). This time was the busiest time for walk-in customers to pay their bills and it placed a burden on the other employees to cover for Denicola's absences. (*Id.*).

When she first started in the Water Department, Daley gave Denicola only a limited portion of the duties of a Water Clerk. When she mastered those duties, the plan was to give Denicola the rest of Water Clerk duties. (Ex. G Aff. Daley). Denicola, however, could not master the basic duties. Daley had to do the other duties for her. She was counseled concerning these issues. (Ex. D, Bates 517). Taylor and Daley met with Denciola to discuss the issues. (Ex. C, Taylor p. 84). Taylor did not feel that Denciola took the discussion to heart. (*Id.*). According to Taylor, DeNicola's worst problem was that she was rude to citizens. Denicola's own notes acknowledge she had negative interactions with customers (although Denicola blames the customers). DeNicolas own notes also acknowledge that Daley frequently criticized her performance. (Ex. D, Bates 181, 174, 179, 178, 180, 517, 173, 172, 171).

The following quotes are examples, from Denicola's own notes produced in discovery, that she knew there were problems:

- "I was told that it [deposit] was short" (Ex. D, Bates 170).

- "I was told that it was short [again] I explained that [other people] handled cash that day [too]" (*Id.*).

- "I explained I could not be held accountable with other people in the cash drawer"(*Id.*).

- "Penny advised the deposit was over . . .." (Ex.D, Bates 173).

- "She [Penny] continually attacked me." (*Id.*).

- "I felt she did not have the patience for me . . . ." (*Id.*).

- "there were times the customers did become irate" (*Id.* at Bates 181).

- "Penny was very upset the deposit was not completed." (*Id.* at Bates 181).

- "She advised me she was sick and tired of dealing with it [the errors]" (*Id.*).

And from her deposition testimony:

- "many, many residents became very angry and many of them became very rude to me." (Ex. A, DeNicola p. 178).

- "They just said . . . that someone complained once again that I was rude." (*Id.* at 179).

- "[customer] said you [Denicola] must be prejudice[d] . . .and she took her money and she stormed out of there." (*Id.* at 182).

- "I was told mistakes were being made." (*Id.* at 185).

- "[Explaining mistakes:] I was a new employee . . . I was being trained . . .
  I was left by myself for four days . . . ." (*Id.* at 185).

- "Q: Do you have any evidence that customers did not actually complain
  about you? . . . A: I wouldn't say that. I'm sure they did . . .." (*Id.* at 187-
  188).

Despite the written counseling and the meeting to discuss the performance issues,
the Town and Town council members continued to receive customer complaints. The
Mayor himself got a complaint and he went to the elderly citizen's house to apologize for
Denicola being rude to her. (Ex. C, Taylor pp. 77-78). In addition, Daley concluded that
Denciola was not mastering the limited duties given her and there was no hope of her
ever assuming the full duties of the Water Clerk. (Ex. G, Aff. Daley). This conclusion
was affirmed in mid-August 2011 when Denciola became so flustered with customers,
and doing her duties, that she locked the doors of the water department in the faces of
customers waiting to pay their bills. (*Id.*). On August 19, 2011, Taylor and Daley met
with Denicola to tell her that the problems had not improved and the Town was
terminating her employment.

**ARGUMENT**

**No Actionable Sexual Harassment Occurred**

**1. DeNicola Only Made One Complaint of Harassment. Only That One Complaint
Should be Considered and that Complaint Was Not About Sexual Harassment**

An employee subjected to harassment is required to utilize her employer's
complaint procedure. DeNicola only made one complaint through the Town's complaint

procedure. (Ex. H Town Anti-Harassment Policy).[1]  That one complaint was about the argument she had with Chris McIntosh.  The McIntosh incident, however, had nothing to do with gender and, therefore, Denicola has no cause of action for sexual harassment.

Although DeNicola testified in her deposition that other incidents occurred that relate to gender, these other incidents should not be considered.  This is because Denicola filed no complaints through the Town's complaint procedure about those incidents.  An employer is not liable for sexual harassment (not culminating in an adverse employment action) if the employee fails to use the employer's complaint procedure.  *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998);  *Burlington Industries v. Ellerth,* 524 U.S. 742 (1998).  The Town has a complaint procedure and Denicola was obviously aware of it because she used that procedure regarding the McIntosh incident.

The sole and only complaint that Denicola made of harassment concerned the incident with McIntosh.  This is also the only complaint that Denicola alleges is related to her transfer and discharge.  As described above, and according to Denicola's own written description and testimony, the incident had nothing to do with gender.  It was a dispute about who was to do a work task and how it was to be done.

Title VII is not a "general civility code." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir.2008).

> "[C]omplaints premised on nothing more than rude treatment by co-workers, callous behavior by supervisors, or a routine difference of opinion and personality conflict with one's supervisors are not actionable under Title VII.  Petty slights,

---

[1] The policy is posted and published in the Town Employee Handbook.

> minor annoyances, and simple lack of good manners do not deter victims of discrimination from complaining about the discrimination. [Thus] **personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable under [Title VII].**"

(internal quotation and citations omitted). *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir. 1997); *Burlington Northern & Santa Fe Ry. Co. v. White*, 524 U.S. 742 (2006).

DeNicola is trying to use Title VII as a mechanism to complain that McIntosh was wrong to get mad at her over a work assignment and the Town wrongfully blamed her for the fight. However, Title VII prohibits discrimination based on membership in a protected class, and is not a general complaint statute. As in *Lightner v. City of Wilmington*:

> [Plaintiff] has tried to take a statute aimed at discrete forms of discrimination and turn it into a general whistleblower statute, which of course Title VII is not . . . It would vitiate Congress's decision to single out these grounds as particularly deserving of protection if Title VII were interpreted as a general employment statute that protects employees from any wrongful discharge.

545 F.3d 260 (4th Cir. 2008).

In *Lightner*, the plaintiff sued under Title VII but testified that the reason for his suspension was to halt an internal investigation and cover-up the employer's wrongdoing. The alleged wrongdoing was that police officers were not filing reports so as to reduce crime statistics and superiors were covering it up. *Lightner*, 545 F.3d at 263. The court held that, because Lightner alleged only that he was fired to cover-up his employer's wrongdoing, Lightner negated his claim of discrimination under Title VII. *Id.* at 256. *Lightner* also makes clear that an employer's attempt to cover up its own wrongdoing is not discrimination under Title VII. *Id.*

Thus, like the plaintiff in *Lightner*, DeNicola seeks to use Title VII as a general wrongful discharge statute, in contravention of its true purpose. Therefore, she has failed to establish a prima facie case for harassment or retaliation and her complaint should be dismissed.

**2. The Only Tangible Employment Actions Denicola Alleges are Her Transfer and Termination. These Were Unrelated to Any Illegal Harassment or Retaliation**

The only adverse employment actions that Denicola alleges are her transfer to the water department and her subsequent termination because of her performance problems in the new job. This presents two insurmountable problems for her lawsuit. First, she blames her transfer entirely upon the incident with McIntosh. Because, as stated above, that incident was not based on gender in any respect, the transfer and subsequent termination have no causal connection to any illegal discrimination. Therefore, they cannot form the basis of a Title VII discrimination claim.

Secondly, even if the Mcintosh argument has some basis in harassment (which it clearly does not) any causal link between the harassment and Denicola's termination was broken. That is because it is undisputed that the Town Administrator made the decision to transfer her. The Town Administrator had no role in any alleged harassment (the McIntosh incident) and he did not perceive the incident to be sexual harassment. In this respect, the case of *Christy v. City of Myrtle Beach,* 2012 Westlaw 2149777 (D. S.C.) is very instructive. In that case, Christy, a female police officer, had three meetings with her superiors. In the first two, she complained, in part, about being treated differently from male officers. Only two months after the second meeting, she asked for, and

received a third meeting. Her purpose in requesting the third meeting was to complain that she had been assigned to work under a lower-ranking officer. It was the third meeting that prompted her superiors to demote her. The court held that the third meeting did not constitute activity protected by Title VII and, therefore, any causal link between Christy's demotion and earlier protected activity was broken. *Id.* at 7. The same logic applies here. According to Denicola's own allegations, the McIntosh argument caused her transfer and later termination. Any link to earlier, possibly protected, activity is broken. Of course, as reflected below, the Town will make clear that Denicola was never harassed and never engaged in activity protected by Title VII.

Another analogous case is *Lee-Crespo v. Schering-Plough*, 354 F.3d 34 (1st Cir. 2003). In that case, the court determined that the plaintiff could not allege her transfer and discharge were an adverse employment action related to sexual harassment. In *Lee-Crespo*, contrary to this case, the plaintiff actually alleged that her supervisor was sexually harassing her. In conjunction with the human resources department, Lee-Crespo's manager decided to transfer her to a new position. Both Lee-Crespo and Denicola initially agreed to the transfer (according to the employer) but later denied ever having given consent. The court held that Lee-Crespo could not allege that her transfer was an actionable adverse employment action because there was "absolutely no evidence that anyone other than non-harassers made the decision or that gender discrimination motivated the decision to move her to a new territory." *Id.* at 46.

Because Denicola's reassignment simply was not related to any illegal harassment and was, in any event, decided by the Town Administrator who had no role in any alleged

harassment, that reassignment and subsequent termination are not tangible employment actions and may not be considered.

### 3. Any Complaints of Alleged Harassment Prior to January 2011 are Untimely

During this case, DeNicola raised a number of other incidents (other than the McIntosh incident) that she alleges were illegal harassment. These allegations are untimely and may not be considered.

In her charge of discrimination, DeNicola alleged the following incidents that she thinks are sexual harassment.

1.     Police Chief Woods would ring a bell when he wanted her to come in his office. (The Chief denies this).

2.     Police Chief Woods would refer to her as "my old pony."

3.     Her car was scratched and someone let the air out of one of her tires.

4.     Chief Woods once asked her if she cooked in the nude.

5.     Officer McIntosh stated, in her presence, that "all women are cunts."

6.     Capt. Frank Mador said he was dreaming about her and asked her to say "fuck."

All of these incidents occurred while Denicola was still working in the police department at various times in 2010.  (Ex. I. Denicola pp. 189-190); (Ex. A Denicola, pp. 69-71, 76-81,119, 253).  None of these allegations can be considered because they all occurred more than 300 days prior to her charge of discrimination.  Denicola filed her charge of discrimination on October 31, 2011 and it was received by the EEOC on

November 2, 2011.  A charge of discrimination must be filed within 300 days of the alleged discrimination.   Therefore, only incidents after January 5, 2011 would be timely.

It is true that, in a claim of hostile environment by sexual harassment, acts prior to 300 days may be considered under a "continuing violation" theory.   *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101(2002).  Under *Morgan*, all that is necessary is that at least one act forming part of the hostile environment occur within the 300 days. "In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment*." Id.* at 118.  However, the timely act must have a "relation" to the prior acts and there can be no "intervening action" by the employer.  *Id.*  The acts listed above have no relationship to the McIntosh argument or Denicola's  transfer and subsequent termination.  They were committed by different persons, at different times, and cannot be said to be pursuant to some sort of conspiracy to sexually harass Denicola.  Therefore, they simply are unrelated to alleged harassment that occurred within 300 days of her charge.  In fact, the only harassment that is timely was the McIntosh argument incident which, as explained above, did not constitute sexual harassment.

Furthermore, several "intervening" actions (as referenced in *Morgan*) by the Town occurred  after these incidents.  As explained in *Morgan*, and also, for example, in *Stewart v. Mississippi Transp.*, an employer's action to remedy an incident is an intervening action that cuts off relation to later incidents.  586 F.3d 321 (5th Cir. 2009). The *Stewart* court explained that the transfer of an alleged harassee was such an action, as would be any effective remedy.  *Id.* at 329.  The McIntosh comment was remedied by the Town.  And, of course, Denicola was transferred just after the McIntosh argument.

14

Therefore, because none of these allegations are related to a timely allegation of actionable harassment, and there were intervening events, the allegations above are untimely and may not be considered.

### 4. Even if All Allegations of Alleged Harassment are Considered as a Continuing Violation, they are Irrelevant and are, In Any Event, Insufficient to Constitute Harassment

Even if they could be considered, none of the allegations listed above were connected with Denicola's transfer and subsequent termination for poor performance. Some of these were never raised to the Town. Some were raised, and addressed, and some had nothing to do with gender. They were all temporally diffuse and unrelated. Even if they are all considered, they are insufficiently "severe and pervasive" to constitute harassment.

As stated above, Title VII is not a "general civility code." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998). "Not every unpleasant workplace is a hostile environment." *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir. 1997); *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2409 (U.S. 2006). Petty slights, minor annoyances, and simple lack of good manners do not deter victims of discrimination from complaining about the discrimination. Thus, **"personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable under [Title VII]."** *Id.* (internal quotation and citations omitted). Title VII "prohibits only harassing behavior that is so **severe or pervasive** as to render the workplace objectively hostile or abusive." *Id.* The Supreme Court has made it abundantly clear that "simple teasing, offhand comments, and isolated incidents (unless extremely

serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 118 S.Ct. 2275, 2283 (1998). Furthermore, Supreme Court precedent makes clear that the severity and pervasiveness of the conduct complained of is evaluated objectively -- from the perspective of a reasonable person. *Harris,* 510 U.S. at 23. Thus the "mere utterance of an epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate Title VII." *Id.*

Occasional incidents, even if discriminatory "are neither pervasive nor offensive enough to be actionable." *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995). Or, as the Fourth Circuit Court of Appeals has put it, "instead of sporadic [sexual] slurs, there must be a **steady barrage** of opprobrious [sexual] comments." *Patterson v. County of Fairfax*, 215 F.3d 1320 (4th Cir. 2000) (unpublished) (quoting *Bolden v. P.R. Inc.,* 43 F.3d 545, 551 (10th Cir. 2000)); *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 271 (2001) (a single, isolated incident is insufficient to support even a finding that the plaintiff reasonably believed that the conduct was severe and pervasive); *Gallina v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 123 Fed. Appx. 558 (4th Cir. 2005) (quoting *Clark County* and noting that sporadic incidents are not severe and pervasive).

Regarding the alleged bell, Denicola testified that the Chief used the bell "a lot." The Chief denied this and said that Denicola actually bought the bell and gave it to the Chief as a joke for him to call her. It was only used a couple of times. Denicola admitted she made no complaint about the bell to the Town and she admitted it did not interfere with her ability to do her job. (Ex. A Denicola, pp. 64-66). Regarding the alleged "old

16

pony" remark, Denicola admits she made no complaint. (Ex. A. Denicola, p. 74). Regarding her car, Denicola could not say how or why it was tampered with or if the tampering anything to do with her lawsuit. (Ex. A Denicola, pp. 119, 253). This incident occurred, according to Denicola's EEOC charge, in May 2010. The alleged "cooking in the nude" comment occurred, according to Denicola, in June 2010. She testified that she did not complain about this incident to anyone that the comment occurred only once. (Ex. A Denicola, pp. 69-71). With respect to McIntosh's comment, Denicola agreed it only happened once. She testified that she told Capt. Mador about the comment and it did not happen again. (Ex. A Denicola, pp. 76). Finally, regarding Capt. Mador's alleged comment, she testified that this occurred in November 2010 and she made no complaint about it other than to tell Mador she would not say "fuck." (Ex. A Denicola, pp. 76-81). Dencicola said she did not have any "context" for the remarks and, at the time, she had a good mother/son-like relationship with Mador. (*Id.*).

Denicola has not alleged any connection between these alleged comments by three different men on different occasions. Regarding the comments, she admits they only occurred once and were separated by months. Despite accusing Mador and the Chief of harassing her, it was Mador and the Chief whom she ran to and tearfully told about McIntosh's conduct. She admits she did not complain, in any respect, about the other incidents, and never brought any of the incidents to the attention of the Town.

These allegations, even if true, do not remotely constitute "severe and pervasive" harassment. DeNicola was never propositioned or touched. She informally complained only about the McIntosh remark which she admitted was remedied. The incidents were separated by months and were unrelated. The allegations regarding her car do not

17

support her case at all.  As she admits, she cannot say who harmed her vehicle or why.
*See, Goldberg v. B. Green and Co., Inc.*, 836 F.2d 845, 848 (4th Cir.1988) (recognizing that plaintiff's "own naked opinion, without more, is not enough to establish a prima facie case" of discrimination).

The Fourth Circuit Court of Appeals, and many other courts, have rejected the contention that far more egregious conduct was severe and pervasive.  For example, in *Belton v. City of Charlotte* (a racial harassment case) the court found far more overtly discriminatory incidents did not constitute harassment:

> Belton's hostile environment claim hinges on six main allegations that span his nearly thirty-year career: (i) a fellow firefighter used the word "nigger" sometime between 1977 and 1981; (ii) Belton felt isolated as the only African-American Captain in meetings; (iii) Battalion Chief Flowe did not communicate with him when he was Captain (between 1981 and 1990); (iv) Fincher has become angry during meetings and used profanity to address Belton and a white firefighter; (v) other firefighters have reported to Belton since he became Battalion Chief about hearing discriminatory remarks within their own battalions; and (vi) Belton has not been promoted to Deputy Chief. As the district court indicated, these incidents were all temporally remote from each other. Some cannot be characterized as based on race (notably (iv)), and some of the racially hostile remarks were not said in Belton's presence ((v) is hearsay).

175 Fed. Appx. 641, (4th Cir. 2006).

The fact that Denicola did not complain about this conduct greatly undermines any contention that the alleged harassment against her was severe and pervasive.  *See, e.g., Norris v. City of Anderson,* 125 F. Supp. 2d 759, 767 (D.S.C. 2000);  *Haught v. Louis Berkman*, *LLC*, 2005 WL 1530242  (N.D. W.Va. June 20, 2005) ("Haught did not complain about Parissi's conduct until April 23, 2003."); *Boyles v. S. Carolina Dep't of Mental Health,* 2008 WL 149104 (D.S.C. Jan. 11, 2008)  ("Plaintiff did not complain that Hendrix made any other racially discriminatory remarks.");  *Benton v. YRC Worldwide, Inc.*, 3:08-0886, 2009 WL 3350345 (M.D. Tenn. Oct. 15, 2009) ("Benton did not

complain to management about any racially hostile conduct."); *Kolnicki v. Ford Motor Co.,* 1995 WL 431185 (N.D. Ill. July 17, 1995) ("Kolnicki did not complain of much of the conduct. Moreover, the incidents took place over a period of several years, spanned several states, and involved many different individuals."); *Thomas v. Austal,* 2011 WL 2078525 (S.D. Ala. May 26, 2011) ("Thomas admits that he did not complain about two of the only three instances concerning his co-employees offensive behavior. Plaintiff has offered no explanation as to why she did not complain about these other alleged incidents.").

The alleged incidents were also separated by months. Although she claimed the bell was rung often, the Mador remark happened in November 2010, the McIntosh comment in September 2010 and the Chief's comment in June 2010. Even assuming the use of the bell was often, there was no evidence the Chief's intent regarding it was gender-related and her description of its use is vague to the point of meaninglessness. *See, e.g., Huggins v. N.C. Dept. of Admin*, 2013 WL 5201033 (E.D. N.C. 2013) ("[without] dates, times, or circumstances [such] assertions standing alone are insufficient to sustain a Title VII claim."). In *Huggins,* unlike this case, there was an allegation of physical contact, however, the court held, the contact was ambiguous and did not support a harassment claim. *See also, Causey v. Balog*, 162 F.3d 795, 802 (4th Cir.1998) ("conclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment"); *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 676 (4th Cir.2011) ("allegations '[un]substantiated by accounts of specific dates, times or circumstances,' are too 'general' to suffice").

19

The courts have clearly rejected such allegations of incidents, separated in time and context, as insufficient to meet the "severe or pervasive" standard.  The incidents in the *Belton* case (discussed above) were similarly diffused by time.  Similarly, in *Hopkins v. Baltimore Gas and Electric*, (a sexual harassment case) the plaintiff alleged that his supervisor sexually harassed him by making constant comments and touching him over a seven year period.  77 F.3d  745 (4th Cir. 1996).  The incidents averaged around one or two per year and included such conduct as the supervisor squeezing into a revolving door with the employee, asking the employee "do you like me," putting a magnifier over his crotch and asking "where is it?" and similar conduct.  The court held that:

> For his claim, Hopkins relies on conduct by Swadow that was temporally diffuse, ambiguous, and often not directed specifically at him.   First, the incidents that Hopkins recounts occurred intermittently over a seven-year period, with gaps between incidents as great as a year.   That alone suggests the absence of a condition sufficiently pervasive to establish Title VII liability**.  A handful of comments spread over months** is unlikely to have so great an emotional impact as a concentrated or incessant barrage.

77 F.3d at 753 (emphasis added).  *See also*, *Gallina v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 123 Fed. Appx. 558 (4th Cir. 2005) (quoting *Clark County* and noting that sporadic incidents are not severe and pervasive); *Finnegan v. Dep't of Pub. Safety & Corr. Servs.*, 184 F. Supp. 2d 457, 462 (D. Md. 2002) ("incidents alleged by Finnegan were infrequent and there is no allegation that the verbal reprimands or comments by Evert were physically threatening or unreasonably interfered with her work performance");  *Carter v. Ball*, 33 F.3d 450, 461 (4th Cir.1994) ("The existence of a hostile environment cannot be predicated upon acts that are isolated.");  *Lawrence v. Geren*, 2008 WL 4680566 (D. Md. Oct. 17, 2008) ("isolated comments . . . occurred over the span of approximately twelve months"); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d

766, 768–69 (4th Cir.1997) (Dismissing sexual harassment claim because six verbal incidents over a period of approximately three months was insufficiently severe and pervasive); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365–66 (10th Cir.1997) (finding five sexually-oriented statements over sixteen months insufficient to show hostile work environment, even though one comment by the offender occurred as he put his arm around plaintiff, looked down the plaintiff's dress and said, "well, you got to get it when you can.").  In summary, Denicola's vague allegations of isolated incidents spread over a year do not constitute severe and pervasive sexual harassment.

**5. Any Claim of Termination or Retaliation is Defeated by the Town's Legitimate and Non-Discriminatory Reason for Discharge (which the Plaintiff has admitted is true).**

This is not a direct-evidence case.  Denicola has no direct evidence that Taylor considered any alleged complaint about sexual harassment as a reason to terminate her. The prima facie case for an allegation of harassment culminating in termination, or for termination for complaining of harassment, requires evidence of  "a causal connection" between the protected activity or harassment and the adverse action.  *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th. Cir. 1985);  *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir.2004) (en banc).  *Mays v. City School Bd. For the City of Lynchburg*, 5 Fed. Appx. 181 (4th. Cir. 2001) (citing *O'Connor v. Consolidated Coin Caterers*, 517 U.S. 308, 312-13 (1996).

Regardless of how a termination claim is framed (based on harassment or based on retaliation) the claim is defeated if the employer offers a legitimate non-discriminatory reason which the plaintiff cannot rebut.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir.2004) (en banc); *Ross v. Communications Satellite Corp.,* 759

F.2d 355, 365 (4th. Cir. 1985); *Mays v. City School Bd. For the City of Lynchburg*, 5 Fed. Appx. 181 (4th. Cir. 2001)

Denicola was terminated because of her poor performance in the Water Department and, primarily, because of her rudeness to customers and inability to master the limited duties she was assigned. She admitted in her deposition, and in her notes, that she had negative interactions with customers (although she blames the customers). She also acknowledges that she made mistakes in performing her duties. She therefore cannot rebut the Town's legitimate and non-discriminatory reason for terminating her. Having admitted the Town's concerns were true, her claim is defeated. *See, e.g., Ham v. Washington Suburban Sanitary Com'n*, 158 Fed. Appx. 457 (4th. Cir. 2005) (summary judgment proper where plaintiff admitted his management style was abrupt); *Vandevander v. Voorhaar*, 29 Fed. Appx. 169 (4th. Cir. 2002) (dismissal of termination claim upheld when plaintiff could not rebut the employer's reason for termination even if Plaintiff had engaged in protected conduct or was harassed); *Campbell v. University of Akron,* 211 Fed.Appx. 333, 348, 2006 WL 2986404, 12 (6th. Cir. 2006) ("because Campbell cannot rebut as pretext the University's legitimate non-discriminatory reason for hiring Grizer, he still cannot prevail on this claim"); *Boone v. Galveston Independent School Dist.* 126 Fed.Appx. 660, 662, (C.A.5 (5th Cir. 2005) (same); *Kahl v. The Mueller Co., a Tyco Intl. Ltd. Co.,* 1999 Westlaw 196556, 5 (6th Cir. 1999) ("the district court correctly found that he cannot rebut Mueller's legitimate, nondiscriminatory reasons for terminating his employment, to wit-poor performance.").

The link of causation is even further removed from the any alleged sexual harassment than in the cases cited above. As discussed above, the Town Administrator

fired DeNciola.  He had no link to the alleged harassment and he did not perceive the
McIntosh incident to be sexual harassment.  The case of *Lee-Crespo v. Schering-Plough*
(also discussed above) makes this point very well.  354 F.3d 34 (1st Cir. 2003).   In that
case, Lee-Chrespo complained she was being harassed.  Like Denicola, she was
transferred away from the offending co-worker by manager who had no connection to the
alleged harassment.  Lee-Crespo did not like her new assignment, did not do well in it,
and ultimately resigned.  She claimed the harassment caused her constructive discharge
because the reassignment would not have occurred but for the harassment.  The court
disagreed and held that any causative link between protected activity and discharge was
broken because the plaintiff had been transferred by managers who were not involved in
the alleged harassment and her subsequent problems in the new position were
independent of the harassment.  The same logic applies to Denicola's case.  *See also,*
*Christy v. City of Myrtle Beach*,  2012 Westlaw 2149777 (D. S.C.) (holding that, although
Christy had made protected complaints two months before her discharge, it was clear she
was terminated for making an unprotected complaint just before her discharge).

Because, therefore, Denicola has admitted the Town has legitimate reasons to
terminate her, and those reasons are not connected to any protected conduct, summary
judgment should be granted as to her claims of harassment and retaliation.

### 6. Denicola Cannot Assert a Claim for Alleged Harassment as a Public Policy Discharge Claim Because She has Existing Remedies

Denciola has also brought a state-law claim for discharge in violation of public
policy.  In South Carolina, the general rule remains that all employment is "at-will" and
employees may be terminated, or may quit, for any reason or no reason at all.  This was

reaffirmed most recently in *McNeil v. S. Carolina Dep't of Corr.*, 2013 Westlaw 1830826 (S.C. Ct. App. May 1, 2013). *McNeil* is also the most recent case dealing with the public policy exception to the at-will employment rule.

South Carolina courts do recognize a cause of action for discharge in violation of public policy. However, as the *McNeil* court reaffirmed, it has been applied only to situations in which an employee was forced to choose between his job and committing an illegal act or to cases in which employees were terminated for exercising certain political rights. *Garner v. Morrison Knudsen Corp.,* 456 S.E.2d 907 (S.C. 1995); *Antley v. Shepherd*, 532 S.E.2d 294, 297 (S.C. 2000) (aff'd as modified 564 S.E.2d 116 (S.C. 2002)).

No matter what the scope of the public policy exception, however, the South Carolina Appellate Courts have made clear it does not include situations in which an employee has an existing remedy. Denicola's public policy claim is based on the same allegations supporting her harassment and retaliation claims. Obviously, harassment and retaliation has an existing remedy and, therefore, DeNicola cannot assert a state public policy discharge claim.

> In *Ludwick, supra,* we recognized an exception to [the at-will employment] rule in order to allow an at-will employee to bring a wrongful discharge action where the employee was discharged because she complied with a subpoena to testify at a state agency hearing. We found such a discharge constituted "a violation of a clear mandate of public policy" because it required an employee, as a condition of employment, to violate the law. 337 S.E.2d at 216. **We decline to extend the *Ludwick* exception to a situation where, as here, the employee has an existing remedy for a discharge** which allegedly violates rights other than the right to the employment itself.
>
> Here, **appellant claims an infringement of his constitutional rights to free speech** and association. Title 42 U.S.C. § 1983 (1982) allows a civil action for damages against a government official who deprives an individual of a constitutionally protected right. A public employee, even one employed at-will,

> may state a claim under § 1983 for violation of his First Amendment rights by alleging damages from hiring decisions that are based solely upon political belief or association and are unjustified by a vital government interest. *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

*Epps v. Clarendon County,* 405 S.E.2d 386, 387 (S.C. 1991) (emphasis added).

Because the South Carolina Supreme Court has clearly held that claims with existing remedies precludes application of public policy discharge, this claim must be dismissed.

## CONCLUSION

For the foregoing reason, the Defendants request the court grant its motion for summary judgment as to all claims and dismiss this matter.

Attorney for the Defendant,

/s/Charles F. Thompson Jr.
Charles F. Thompson, Jr. (05969)
Katherine Phillips
Malone, Thompson, Summers & Ott
339 Heyward Street
Columbia, S.C. 29201
803-254-3300

This the 10th day of December 2013